DRESCO MECHANICAL CONTRAC-
TORS, INC., et al., Plaintiffs,

v.

TODD–CEA, INC., Defendant-Third-Party
Plaintiff-Appellant,

v.

J. W. AUSTIN, JR. & ASSOCIATES,
INC., Third-Party
Defendant-Appellee.

No. 75–1009.

United States Court of Appeals,
Fifth Circuit.

May 24, 1976.

Rehearing Denied June 25, 1976.

Clayton H. Farnham, Earle B. May, Jr., Atlanta, Ga., for appellant.

David A. Handley, Atlanta, Ga., for J. W. Austin & Associates, Inc.

Before DYER and CLARK, Circuit Judges, and KRAFT,[*] District Judge.

CLARK, Circuit Judge:

In this Georgia tort law diversity case, defendant/third party plaintiff Todd-CEA, Inc. (Todd) appeals from a judgment notwithstanding the verdict entered in favor of third-party defendant J. W. Austin, Jr. & Associates, Inc. (Austin). Agreeing with the trial court that there was no competent evidence in the record establishing a violation of any duty owed by Austin, we affirm.

The case grew out of a boiler explosion April 1, 1971, on the Athens campus of the University of Georgia. The plaintiffs in this action, Regents of the University System of Georgia, Georgia Education Authority, and Dresco Mechanical Contractors, Inc., (Dresco) entered into a contract for the construction of a two-boiler heating plant at the University. The defendant, Todd-CEA (Todd), designed and manufactured the burners and combustion controls for the new facility under a subcontract with Dresco. Third-party defendant Austin contracted with the Regents to act as a consulting engineer on the heating plant. The part of its function pertinent here was to review the design specifications for the system prepared by Todd in conformity with the general design requirements first set out by Austin in the pre-bid job description.

The explosion took place during a test run of the boiler system before final turnover of the completed job to the University. Todd's employee, Lucas, was in the process of conducting the test by means of bypassing sections of the boiler system's control board with "alligator clips." Through a disputed combination of causes, a volatile fuel mixture built up in boiler number one during a low-water shutdown phase, and seconds later the boiler exploded, causing extensive damage. Plaintiffs' theory was that the explosion had been caused by Todd's negligence in the "design, manufacturing, installation, inspection, testing and operation" of the boiler and burner control system. At trial they produced extensive testimony tending to show that the control units arrived from the off-site point of manufacture by Todd in a miswired condition that did not conform either to the design specifications approved by Austin or to Todd's own drawings purportedly depicting the system "as built"; that a damper control motor had been installed backwards, in a fashion that closed the damper when it was supposed to open, contributing to the gas buildup in the unit; that Lucas conducted his tests in a trial-and-error fashion with the annunciator system disconnected and without conducting a fuelless "dry run" to determine how the system was operated. Several witnesses testified that they feared for their safety during the tests because Lucas' actions were causing the boiler to vibrate noticeably. Todd defended at this stage of the action by presenting evidence that Lucas had acted reasonably in his con-

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

duct of the tests. In sum, Todd's evidence tended to show that the annunciator system provided no additional safety factor because the boiler was designed to shut down if unsafe conditions, like a flameout, occurred; that the only way wiring errors can be tracked down is by some sort of trial-and-error procedure; that dry-run tests are of little value in determining how the system actually will operate; and that the real cause of the explosion was the existence of a dual timer burner control system, insisted upon by Austin, that sent contradictory signals throughout the system. The latter evidence was introduced despite the trial court's decision, before the taking of testimony, to try the primary action without participation by Austin after jury selection beyond the presence at and observation of the proceedings by its counsel and then to try the third-party action (if needed) before the same or a different jury, depending on the length of the trial.[1]

After a nine-day trial and two days of deliberations, the jury returned a verdict for the plaintiff, necessitating trial of the presently appealed third-party action. It was tried before the same jury.

Todd advanced two theories for recovery from Austin: that Todd and Austin were joint tortfeasors, and that Todd's negligence was merely "passive" while Austin's was "active." The proof offered to support these claims focused on the dual timer system. Todd and its witnesses posited that specification of a dual timer system was negligent in itself because such a system created the possibility of conflicting signals, whereas a single timer system would not contain such a hazard. Austin sought to show that there is nothing inherently negligent about specifying a dual timer system and that if built and installed properly, such a system could be operated safely and generate significant cost savings by avoiding unnecessary shutdowns of the boiler system. Austin further adduced proof that,

instead of specification errors, errors in construction, installation and testing had caused the explosion.

The jury responded to special interrogatories propounded by the court as follows:

### VERDICT

1. Was J. W. Austin & Associates negligent in failing to reject or disapprove the use of two timers, rather than one? ( X ) Yes ( ) No

 If your answer to Question No. 1 is yes, then answer Question No. 2.

2. Was such negligence a contributing proximate cause of damages found by you in your previous verdict? ( X ) Yes ( ) No

 If your answer to Question No. 2 is yes, then answer Question No. 3.

3. Was the negligence of Todd-CEA upon which you based your prior verdict active and positive negligence? ( X ) Yes ( ) No

 If your answer to Question No. 3 is no, then answer Question No. 4.

4. Was the negligence of J. W. Austin as found in your answer to Question No. 2 active and positive negligence. ( ) Yes ( ) No

However, after receiving and considering motions and briefs submitted by the parties, the district court entered the following order:

The Court being of the opinion that the evidence in the case will not support a finding that the specification of a dual timer system is inherently negligent, or even that the explosion itself was the proximate result of the use of a dual timer system, the motion of the third-party defendant, J. W. Austin, Jr., & Associates, Inc., for judgment N.O.V. is hereby GRANTED.

Alternatively, in the event the above ruling should not be sustained in the Court of Appeals, the Court hereby con-

---

1. This procedure was acquiesced in by Austin's counsel before the beginning of the trial, although at various points during the primary action, he expressed some uneasiness and a desire to participate. None of these expressions, however, could be characterized as an objection to the procedure or a demand for full participation.

tingently grants the motion of the third-party defendant, J. W. Austin, Jr., & Associates, Inc., for a new trial.

This 6 day of December, 1974.

In this court, Todd argues that there was competent evidence in the record to sustain the jury's verdict and that the judgment n. o. v. should be reversed and judgment rendered on the verdict. Austin argues that the trial court was correct in entering judgment n. o. v., but that even if it was not, numerous grounds exist for granting the motion for new trial. We turn first to the propriety of the judgment notwithstanding the verdict.

 Todd's action against Austin rested on a theory of negligent design. To establish a cause of action on such a theory under Georgia law, Todd was required to establish that Austin's acts or omissions breached its duty to observe the standard of care it owed to those with whom it dealt and that this breach was a proximate cause of the occurrence from which damage was suffered. As an engineering firm, Austin's duty of care was that of a responsible *professional* person or organization. It is

. . . the obligation to exercise a reasonable degree of care, skill, and ability, which generally is taken and considered to be such a degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by their respective professions.

*Bodin v. Gill*, 216 Ga. 467, 472(1), 117 S.E.2d 325, 330 (1960); *Housing Authority v. Ayers*, 211 Ga. 728, 733(6), 88 S.E.2d 368, 373 (1955); *Covil v. Robert & Co.*, 112 Ga. App. 163, 144 S.E.2d 450 (1965). *See also Block v. Happ*, 144 Ga. 145, 86 S.E. 316(18 ). It was Todd's burden to establish the failure to observe this standard by the introduction of expert opinion evidence. *See, e. g., Shea v. Phillips*, 213 Ga. 269, 271(2), 98 S.E.2d 552 (1957).

Todd presented the testimony of several witnesses to show that Austin had established the original requirement for a "completely redundant . . . dual flame safeguard system" and had refused to approve a change to a single timer system when Todd's engineers described it to them as "unsafe." Witness Horton Rucker, an employee of an engineering firm not involved in the suit, explained why he believed the explosion to have been caused by the dual timer system. He stated the dual timer presented a "bad situation" because of the possibility that the timers would get out of synchronization and send improper signals to the system. He said he had no personal experience with such a system in his twenty-five years of experience in the field of boiler and burner-control engineering.

James Warren of Honeywell, Inc., the manufacturer of the timers, testified that he "[didn't] believe [he] would try using these particular programmers in parallel" because "as long as everything [was] going well they would probably work all right. But if things started going wrong, they would get false messages and get confused."

In short, Todd's proof presents a convincing theory of the *cause* of the explosion and for the proposition that Austin participated in—or perhaps even dictated—the decision to install the system whose malfunction lay at the heart of that theory. What is missing is any sort of unequivocal statement by any witness that Austin's specification of the dual timer system or its manner of reviewing Todd's detailed plans failed to conform to the ordinary accepted practices of the engineering profession. An examination of Rucker's testimony demonstrates considerable lack of communication between counsel and witness, and neither the questions nor the answers establish whether Rucker was describing a "bad situation" inherent in the design or a "bad situation" that obviously resulted in this instance. Rucker stated that he was "totally unfamiliar" with dual timer systems prior to his inspection of the system involved in the case *after* the explosion. However, he did not intimate that this lack of familiarity was based upon the fact that such systems were not safe to use or not customarily put

to use by others. Thus, he could have no basis for a professional judgment that a dual timer design was inherently unsafe or failed to conform to engineering practice. Likewise, Warren's testimony does not refer to the professional standard. It is true that he said he "didn't think" he would use such a system, but neither his position nor any reasons for it are free from ambiguity.

In marked contrast to these statements is the testimony of Austin's independent expert witness, Alderman. He stated unequivocally that the original Austin specifications were "excellent" and "complied generally and extrapolated on" the generally accepted practice of mechanical engineers in Georgia during the relevant time period. He further stated that the specifications for the dual flame safeguard system in specific met the accepted standard and that it was the standard practice for consulting engineers to review builders' wiring diagrams only for general compliance with the specified concept. He concluded his direct testimony as follows:

Q Mr. Alderman, will you state whether or not the use of dual timers if they are properly wired, is a practice which can be carried out safely in a flame safeguard system, if they are properly wired?

A There's no doubt in my mind that an expert wiring control designer and system designer could successfully wire dual flame scanners, relays and timers.

Q Is the practice of not checking the wiring, details of shop drawings for workability, is that the general accepted practice among consulting mechanical engineers in this State and was the practice in 1969, 1970 and '71?

A It is the common practice.

■ In reviewing the correctness of the trial court's decision to take a case from the jury by directed verdict or judgment notwithstanding the verdict,

the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in light and with all reasonable inference most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is,.evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

. . . [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). When this test is applied here it requires the conclusion that there was no substantial evidence opposed to the motion on the element of Austin's violation of the standard of care imposed on it. Therefore, the trial court properly refused to allow the jury's verdict to stand.

■ We are reinforced in our conclusion that the trial court correctly granted judgment notwithstanding the verdict by our examination of the second holding in *Covil v. Robert & Co., supra,* wherein the court stated that, although nonsuit was improper because there was a conflict in the evidence on standard of care, defendants' demurrer should have been sustained because the petition failed to allege that the defendants' specifications were followed by the builder, an essential part of the proof of causation in a Georgia negligent design case. 112 Ga.App. at 168, 144 S.E.2d at 455. The case before us presents the obverse of *Covil*: the allegation of compliance is present, but the proof is absent, both on this narrow point and the broader issue of standard of care, as discussed above. The record clearly discloses that the damper control motor was installed backwards and

that the very reason for Lucas' electrical spelunking was that the controls as installed did not conform to the diagrams he had been given or to the original drawings. The requirement that the party alleging negligent design show that the system was built as designed represents a policy choice to avoid the complicated questions of technical cause that could be generated by its omission. While we might dispute the need for such a policy in a case like this one, where Todd need only establish that Austin's fault contributed to the explosion in order to recover a portion of the damages assessed against it, we decline to fashion a holding on the unfounded assumption that a Georgia court would share our doubts and act accordingly. *See Erie Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, under the *Shipman* evidentiary standard[2] and the substantive law of Georgia, we conclude that the trial court correctly ruled it was not shown "even that the explosion itself was the proximate result of the use of a dual timer system."

We need not and do not reach any of the grounds asserted with respect to the conditional grant of a new trial. The judgment notwithstanding the verdict is

AFFIRMED.

---

**2.** It is well settled in this Circuit that in diversity cases federal courts apply a federal rather than a state test for the sufficiency of evidence to create a jury question.

*Boeing Co. v. Shipman, supra,* 411 F.2d at 368.