**William T. HARRELSON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV475–86.**

United States District Court, S. D. Georgia, Savannah Division.

Sept. 20, 1976.

Bernard M. Portman, Smith & Portman, Savannah, Ga., for plaintiff.

G. R. Dubus, Chamlee, Dubus & Sipple, Savannah, Ga., Lawrence F. Ledebur, Chief Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., for defendant.

Edward T. Brennan, Adams, Adams, Brennan & Gardner, Savannah, Ga., for intervenor, Argonaut Insurance Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAWRENCE, Chief Judge.

### I

#### Background

This action is brought by a machinist employed by a ship repairer who was injured in 1973 while working aboard the Navy T–2 tanker "Saugatuck". The vessel was in drydock at Savannah.

The suit against the United States by Mr. Harrelson is under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. and constitutes an admiralty or maritime claim under Rule 9(h). It was filed in 1975 in the District Court for the Southern District of New York and removed to this District pursuant to 28 U.S.C. § 1404(a). The case was tried without a jury on May 20–21, 1976.

At the request of counsel for plaintiff a decision has been withheld pending rulings in the Court of Appeals for the Fifth Circuit in cases now before it bearing upon the duty and standard of care owed by a shipowner to a longshoreman or harbor worker under the 1972 Amendments to the Long-shoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b). The cases on appeal are Guerra v. D/S, A/S Laly, No. 73–H–1359, S.D., Texas, 3/10/75 and Gay v. Ocean Transport & Trading, Ltd., No. 75–1443, S.D., Fla., 3/21/75. Upon inquiry I find that they are not calendared for argument until November 1st. Due to the extremely heavy caseload in the Fifth Circuit, a decision cannot be expected until after the first of the year. I have decided not to wait for rulings which may or may not be of especial relevance to the present case.

### II

#### The Evidence

At the time of the injury the "Saugatuck" was in dry dock at Savannah Machine & Shipyard Company undergoing an annual overhaul. As demonstrated by the specifications, the job was an extensive and expensive one. The cost of the repairs, materials and labor furnished and performed by the repairer amounted to $603,471.89.

No crew was aboard the vessel while she was in the dry-dock. Her captain, the first mate, the chief engineer and his assistant were present for the purpose of seeing that the contractor carried out the work properly. James W. Carter, Port Engineer of Hudson Waterways Corporation, was also aboard during the period of overhauling. That Company was the private contract operator of the tanker. As such, it was responsible for maintenance and repairs. The "Saugatuck" went into dry-dock on May 15, 1973. On the same date overhauling commenced. She would have been ready for sea on June 18th. The injury to plaintiff occurred on June 12, 1973.

Plaintiff had been in the employ of Savannah Machine & Shipyard as a machinist for around 28 years. He was 57 years old at the time of his injury. It initially consisted of a fracture of the right distal fibula. Plaintiff was engaged in work connected with the testing of cargo tanks for leaks at the time he was injured. He was alone in the after pump room where the controls are located for transferring water from one

tank to another.[1] The accident occurred about 4 P.M. as Harrelson was about to leave after setting the pumps. He was suddenly struck on the top of his right ankle by a falling object. He caught only a "fast glimpse" of it and heard a "whizzing noise".[2] Mr. Harrelson testified that he did not think it was a tool. It apparently fell a distance of about 20 feet. The object glanced off plaintiff's foot and into the uncovered bilge. It was never recovered or identified.[3]

Harrelson testified that a machinist and his helper were working on the first level above him and that the helper, a new employee named Albert Schuenemann, informed him the same day that "something was laying there" and that he had "touched it". Schuenemann later told the leaderman, Malcolm D. Arnsdorff, that he had "knocked something off and it fell". The helper did not know whether it was "an iron wedge, chisel or what". Harry Showalter who was the machinist working with Mr. Schuenemann on the level above the pump room testified that shortly after the incident the former told that he had "moved something" and that he felt his "foot hit something".[4]

Schuenemann said he was using a wrench and a hammer and missed none of his tools after the incident. Mr. Showalter had used a wrench and sledge hammer. He testified to the same effect. A grating with square bars (sometimes referred to as a "catwalk") comprised a portion of the decking of the second level above where Harrelson was working below. The openings in the grating, according to the Port Engineer of Hudson Waterways, are approximately 7/8ths of an inch by 2 inches in size. The distance from the grating to the deck of the pump room is about 20 feet.

Plaintiff contends that the object that struck his ankle must have been lying on the grating prior to the delivery of the vessel to Savannah Machine & Shipyard Company for overhauling. Mr. Harrelson testified that he went back aboard the vessel, after receiving first aid, to investigate the cause of his injury. A rust imprint was found on the grating near where Schuenemann and Showalter had been working, with the rust embedded in the paint. It appeared to plaintiff to have been there "a long time".[5] Mr. Schuenemann who observed the rust spot along with Harrelson testified that it "looked like it had been there a while". The dimension of the rectangular imprint, according to plaintiff and to Schuenemann, ranged from 6½ to 7½ inches long by 2 inches to 3½ inches.

James W. Carter who, as stated was Port Engineer of Hudson Waterways testified concerning the repairs at Savannah. Certain work was performed in the after pump room across the top of which there is a hatch cover. It was opened to permit access and removal of large equipment required in the overhaul of the vessel. Removal work was done on the hatch cover as part of the repairs. The cover is secured by

1. The pump room which is located in the lower level of the vessel is 10 to 12 feet long and its width runs from port to starboard side of the hull (35 feet).

2. I am dependent upon my trial notes and memory as to most of the oral testimony in the case. The record has not been transcribed.

3. According to Harrelson, the bilge could not be pumped out while the vessel was in port because of the pollution factor. There was 4 to 5 feet of water in the bilge. The accident was not reported to the shipowner or to the contract operator of the "Saugatuck". Savannah Machine & Shipyard made no investigation of the circumstances and cause of the injury. Apparently the shipowner knew nothing of the injury until suit was filed against it.

4. Mr. Harrelson had testified on deposition in this connection:
   "Q. And you said that someone told you they kicked something over. Is that right?
   a. Yeah. Harry Showalter's helper. He knew that he kicked it over. But he said he just didn't know there was anybody down there or something other." Dep. p. 13.

5. In Mr. Harrelson's pretrial deposition he testified: (p. 15). "[T]here was the impact of it, you know, a rusty spot on the grate. Now those gratings . . . they are flat bar steel with openings of approximately one inch or something like that, openings in them see. Anything can fall through them."

means of bolts and "dogs". The latter are used to tighten the bolts. They are frequently left lying loose when it is open. The dogs are approximately 9 inches long and 1½ to 2 inches wide. Mr. Carter expressed the opinion that it was possible for one of them to fall into the pump room. During the time the ship was in dry-dock he did not observe the presence of any object on the grating. Nor did any other person, including Schuenemann.

Harrelson went to the first aid station after the accident. It was not known at the time that his ankle was fractured. Under the heading "Description in Patients Words" the accident report card contained the following entry: "chisel fell from overhead, struck ankle". It is not clear from whom that information was obtained. It might have been from the night supervisor or the leaderman. Harrelson testified that the only information he gave was that "something fell on my ankle". The employee in charge at the first aid station, A. Glenn Cox, stated that the words in the report were Harrelson's as far as he remembered. After Mr. Cox left the stand, plaintiff testified that he might have reported that he was hit by a "chisel, wedge, or something". He explained that he had not returned to the scene of the accident when he made the statement.

According to the written report of the accident signed by the Machinist Supervisor, George A. Waters, an employee "placed tool in unsafe place then put hammer in same place causing wedge to fall". However, Mr. Waters could not say from whom he got the information. He testified that he may not have made an investigation. The leaderman, Malcolm Arnsdorff, had just left plaintiff in the pump room and was two-thirds of the way up the stairway when the accident occurred. He heard about it later. Mr. Arnsdorff did not observe any unsafe condition of the grating. No one mentioned anything to him concerning a "rust spot".

At the trial the defendant presented an expert witness as to the formation of rust in the hold of a ship. Captain Harry E. Jennings who is a marine surveyor had extensive experience with cargo vessels during his career as a ship's officer and master. He testified that rust forms rapidly under the conditions of high humidity and temperature in a pump room. A trace of rust may appear within 24 hours. However, he admitted that heavy rust which entered a painted surface would take a considerable time. A chemist expert for the defendant testified that rust could develop in a matter of days. However, for metal to leave an impression on a painted surface would "take some days".

The fracture of plaintiff's ankle normally would not have been a particularly disabling injury after the bone healed. It turned out to be very much so. On March 13, 1974 (twenty-one months after the injury) Mr. Harrelson's orthopedic surgeon informed the insurer and employer that Harrelson was able to return to work with the following limitations: "No prolong walking, standing, climbing ladders or work on slippery or uneven surfaces."

What had occurred was that, despite healing of the fracture, plaintiff continued to experience pain in his foot and ankle. He was referred to a physician who diagnosed the trouble as a condition known as causalgia, the symptoms of which are pain and trophic skin changes attributable to injury of the sympathetic peripheral nerve and a resulting hyperactivity of the nervous system. An operation known as a lumbarsympathetectomy was performed. It involved removal of a section of the nerve in order that its fibers going to the injured limb are interrupted.

Because of the work restrictions made by the physician, plaintiff was not acceptable to the Company for further employment as a machinist. Mr. Harrelson has not obtained employment elsewhere. He says that he continues to experience severe pain in walking. According to Dr. Thomas L. German, there is a 20% permanent partial disability of the limb.

It is clear that the ankle injury eventuated in plaintiff's inability to perform his job

as a machinist which involved labor aboard vessels.

## III

### Duties and Standard of Care Owed by Owner of Vessel Turned Over to Ship Repairer or to Stevedore

The complaint alleges that the injury was the result of "the dangerous and defective condition of said vessel and its appliances, and the negligence of the defendant, its agents and employees".

There can be a recovery for negligence but not one on the theory of breach of implied warranty of seaworthiness under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act. It provides:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party in accordance with the provisions of Section 937 of this title . . . . If such person was employed by the vessel to provide ship building or repair service, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred." 33 U.S.C. § 905(b).

■ The Amendment requires a uniform federal negligence standard similar in nature to the traditional land-based negligence rule. *Napoli v. [Transpacific Carriers*

*Corp.] Hellenic Lines, Ltd.,* 536 F.2d 505, 507 (2nd Cir.); *Hite v. Maritime Overseas Corporation,* 380 F.Supp. 222 (E.D., Texas); *Slaughter v. S.S. Ronde et al.,* 390 F.Supp. 637, 645 (S.D., Ga.), aff'd, 5 Cir., 509 F.2d 973.

■ While a shipowner can be found liable on the theory of its failure to provide a safe place for anticipated work, such determination must be based on negligence principles and not upon any concept of nondelegable duty or of absolute, no-fault, strict liability of the owner. *Bess v. Agromar Line,* 518 F.2d 738 (4th Cir.); *Solsvik v. Maremar Compania Naviera, S.A.,* 399 F.Supp. 712 (W.D.Wash.); *Griffith v. Wheeling Pittsburg Steel Corporation,* 521 F.2d 31 (3rd Cir.).[6] Prior to 1972, where a vessel was withdrawn from navigation for repair and no warranty of seaworthiness therefore existed, a shipowner was liable for failure to provide a reasonably safe place to work to those whose presence aboard was foreseeable. *Stark v. United States,* 413 F.2d 253 (5th Cir.); *Vickers v. Tumey,* 290 F.2d 426, 432 (5th Cir.), *White v. United States,* 400 F.2d 74, 76 (4th Cir.).

The 1972 amendment reaffirms that rule. In the report of the Congressional Committee it is said that nothing was "intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." *3 U.S.Code Congressional and Administrative News,* 1972, p. 4704. A recovery against a shipowner may still be had where a vessel is turned over to an independent stevedoring company if the owner breaches a duty owed to longshoremen under traditional negligence theories.

**6.** David W. Robertson, "Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act". 7 *Journal of Maritime Law and Commerce* (April, 1976) 449–454, 467–469; 1A *Benedict on Admiralty* (7th ed.) § 118; Paul N. Daigle, "Third Party Liability under 1972 LSHWCA Amendments" (Part II), *For the Defense* (August, 1976), Vol. 17, pp. 101–103. In Gilmore and Black, *The Law of Admiralty,* 2d ed. 453, the authors express the hope that the courts will in determining the standards of negligence applicable accept the argument that under § 905(b) the liberal Jones Act concepts in respect to seamen will be made applicable. *Cf. Perry v. Morgan Guaranty Trust Company of New York,* 528 F.2d 1378–79 (5th Cir.). However, the trend of decisions has been decidedly in favor of land-based standards as opposed to maritime law. See, for example, *Crowshaw v. Koninklijke Nedlloyd, B.V. Rijswijk,* 398 F.Supp. 1224 (D. Oregon) and *Napoli v. Hellenic Lines, Ltd., supra,* 536 F.2d at 507; *Anuzewski v. Dynamic Mariners Corp.,* 540 F.2d 757 (4th Cir. 1976).

Bess v. Agromar Line, supra, 518 F.2d at 741–43. The land-based standard of negligence applied by several courts is that expressed in Restatement of Torts, Second, § 343.[7] See Frasca v. Prudential-Grace Lines, Inc., 394 F.Supp. 1092 (D.Md.); Croshaw, supra, 398 F.Supp. at 1229. Anuzewski v. Dynamic Mariners Corp., supra, 540 F.2d 757.

■ From the legislative history of the 1972 amendments admiralty courts have also adopted the common law rule that the owner of a vessel owes no duty to warn longshoremen of open or obvious defects or dangers which could readily be observed in the exercise of ordinary care. See Hite v. Maritime Overseas Corporation, 380 F.Supp. 222 (E.D., Tex.); Cummings v. "Sidarma" SOC, 409 F.Supp. 869 (E.D., La.); Anuzewski v. Dynamic Mariners Corp., 540 F.2d 757, supra. Cf. Napoli v. Hellenic Lines, supra, 536 F.2d at 508–509.

Prior to 1972 admiralty courts in the case of seamen had imported the rule of tort law that the owner of premises is liable to an invitee injured by a fall resulting from a substance or object on the floor when such owner is responsible for its being there or has actual or constructive notice of its presence. A longshoreman slipping on grease must show that the condition has existed for a sufficient length of time to charge the shipowner with negligence. McDonald v. Dingwall Shipping Company, Ltd., 135 F.Supp. 374 (S.D., Texas). In Perry v. Morgan Guaranty Trust Company of New York, supra, 528 F.2d at 1379 (a Jones Act case) the Fifth Circuit found that "there is absolutely no evidence to show how the grease got there, how long it had been there, or that there had been time enough for the shipowner, in the exercise of due care, to have learned of it and corrected the situation." The same result under similar facts was reached by the Second Circuit in

Rice v. Atlantic Gulf & Pacific Co., 484 F.2d 1318, 1320.

IV

Findings of Fact and Conclusions of Law

I treat findings of fact and conclusions of law together. They meld to the extent that at times law and fact are scarcely distinguishable. This Court finds:

■ 1. The burden of proof in admiralty cases is on the plaintiff to show that the defendant was negligent. Gulf Oil Corporation v. The Patsy Chotin, 131 F.Supp. 489 (E.D., Ky.); King v. Testerman, 214 F.Supp. 335, 338 (E.D., Tenn.) Plaintiff must satisfy this Court by a preponderance of the evidence:

(a) that the falling object which caused the injury was not left on the grating by employees of Savannah Machine & Shipyard during the overhauling of the vessel;

(b) that the object which struck Harrelson was the same one which left the alleged rust imprint seen on the grating after the accident;

(c) that the rust indicated that the object that fell had been on the grating when the vessel dry-docked at Savannah four weeks before the accident;

(d) that the defendant shipowner was negligent in failing to discover and remove any such object before or after the vessel was delivered to Savannah Machine & Shipyard for the overhaul job.

■ 2. In Georgia the rule as to sufficiency of proof by use of circumstantial evidence is that the circumstances relied on to establish negligence must not only be consistent with the conclusion sought to be established but inconsistent with every other reasonable hypothesis. Georgia Railway & Electric Co. v. Harris, 1 Ga.App. 714, 717,

7. "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

57 S.E. 1076; *Orkin Exterminating Company v. Callaway,* 126 Ga.App. 431, 190 S.E.2d 827. In diversity cases federal courts apply the state test. *Dresco Mechanical Contractors, Inc. v. Todd-Cea, Inc.,* 531 F.2d 1292 (5th Cir.). Where the circumstantial evidence is as consistent with the theory that the defendant was not negligent as it is with the theory that he was, a jury is not allowed to guess. *Nash v. Raun,* 149 F.2d 885, 888 (3rd Cir.). A verdict for the plaintiff in such a case "could only be the product of surmise, speculation, and conjecture." *Calvert v. Katy Taxi, Inc.,* 413 F.2d 841, 844 (2nd Cir.). *Cf. Evans v. S.J. Groves & Sons Company,* 315 F.2d 335, 342, n. 2 (2nd Cir.); *Calvert v. Katy Taxi, Inc., supra,* at 846.

■ The present case is within the maritime jurisdiction and as to sufficiency of evidence is governed by the federal rule. See *Pavlakis v. Seacrest Shipping Company,* 136 F.Supp. 552, 557 (D.Md.). That case possessed factual similarities to the present. "In argument Counsel for the Bethlehem Company suggested that the wrench which fell may have been inadvertently placed on the catwalk by some member of the ship's crew but there is no evidence in the case to support this contention other than pure speculation." At p. 557.

■ 3. The "Saugatuck" was a "dead ship", completely withdrawn from navigation and in dry-dock. Primary responsibility for the safety of the employees of Savannah Shipyard in respect to ordinary working conditions was that of the contractor. It had complete charge of the vessel. A few of the ship's officers were aboard for the purpose of seeing that the contracted work was properly performed. A shipowner's duties to an independent employee of the contractor do not necessarily end when the vessel is turned over to the ship repairer. Subsequent duties may arise depending upon the facts. See *Bess v. Agromar Line, supra,* at 241–42, n. 8. But this is not a case where there was any such breach of duty by the shipowner.

4. Under the evidence before this Court, it can only conjecture as to what the falling object was or how it happened to be on the grating (if it was) or how long it had been there. During the 27 days the vessel was in dry dock, numerous employees of the contractor worked aboard her. They were all over the place using many kinds of tools in opening and repairing the tanker's valves, pipes, lines, and other primary equipment.

5. This case began as a mystery and ends as an enigma. Neither this Court nor anyone else can say if, when or by whom any tool or metal object was left on the grating. A reliable basis for any ultimate finding of shipowner liability is completely lacking. One can reach the conclusion that plaintiff was struck by a falling metal object which was resting on the grating before it was accidentally dislodged by Schuenemann. But to proceed from that point is to indulge in the merest speculation.

In the absence of probative fact to support a finding of liability by the owner in not furnishing a safe place for the plaintiff to work, judgment must be entered for the defendant.