**Sherry J. ANDERSON, et al.,**
**Plaintiffs-Appellants,**

v.

**CITY OF ATLANTA, et al.,**
**Defendants-Appellees.**

No. 84–8493.

United States Court of Appeals,
Eleventh Circuit.

Dec. 16, 1985.

---

John H. Ridley, Atlanta, Ga., Robert D. Stein, Hapeville, Ga., for plaintiffs-appellants.

W. Roy Mays III, Jeff S. Klein, Marva Jones Brooks, Atlanta, Ga., for defendants-appellees.

Before KRAVITCH and CLARK, Circuit Judges, and PECK *, Senior Circuit Judge.

CLARK, Circuit Judge:

## I. FACTS

### A. *Procedural History.*

This civil rights action, filed pursuant to 42 U.S.C. § 1983, alleges constitutional violations which plaintiffs contend resulted in the death of Larry Gene Anderson while he was in custody at the Atlanta Pre-trial Detention Center. Named as defendants were the individual police officers involved in the arrest of Larry Gene Anderson, R.L. Kelly, W.R. Burks, A. Bieri and M.T. Pickering. Also named as defendants were George Napper, the Commissioner of the Department of Public Safety; Morris Redding, the Chief of Police of the Atlanta Bureau of Police Services; J.D. Hudson, the Director of Bureau of Corrections of the City of Atlanta; and the City of Atlanta.[1]

The trial of this case began on March 13, 1984. On March 19, 1984, after receiving special interrogatories from the court specifically setting out the degree of liability necessary for finding each defendant liable, the jury returned a verdict for plaintiffs. The jury awarded $1 nominal damages and $25,000 punitive damages against J.D. Hudson and $175,000 compensatory damages against the City of Atlanta. On May 15, 1984, the trial judge, on motion by defendants, granted judgment notwithstanding the verdict. He further granted a new trial if the Eleventh Circuit disagreed with his decision to grant the judgment notwithstanding the verdict. This appeal followed.

### B. *The Facts Surrounding the Death of Larry Anderson*

In the early morning hours of January 4, 1983, while on routine patrol, Officer Kelly, of the Atlanta Police Department, observed an automobile, carrying six passengers and being driven by a white female, pull into the parking lot of a closed business. Officer Kelly observed the woman exit the car and walk around in a manner which indicated she was unsteady on her feet. He investigated and determined that the woman, Sherry Nelson, was intoxicated. He then arrested her for driving under the influence. Larry Gene Anderson, one of the passengers in the car, then approached Officer Kelly and stated that he was the person driving the vehicle. He subsequently changed his statement and maintained that he was not driving the vehicle. Based upon Anderson's statement and the fact that Officer Kelly had seen the woman driving the car, Mr. Anderson was arrested for making a false statement to a police officer. While Officer Kelly was verifying information given to him by Ms. Nelson, Elizabeth Jones, another passenger in the car, attempted to shift gears in the vehicle and gave Officer Kelly the impression she was attempting to leave. Officer Kelly then arrested Ms. Jones for driving under the influence. While Officer Kelly was filling out his paper work, Billy Moncus, another occupant of the vehicle, approached Officer Kelly in order to ask several questions regarding the arrest of his friends. As Mr. Moncus walked back to the vehicle, Officer Kelly observed the outline of what he believed to be a gun in Mr. Moncus' back pocket. Moncus was then arrested for carrying a concealed weapon. A paddy wagon was called to transport the prisoners and a female officer was summoned in order to search the female prisoners. Officer Pickering arrived with a paddy wagon and Officer Anna Bieri responded to the call for a female officer.[2]

---

* Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. The entire City Council of the City of Atlanta and Mayor Andrew Young were originally named as defendants. Their motion to dismiss was granted by the court and that order is not appealed.

2. When Officer Kelly initially observed the vehicle being driven by Ms. Nelson, he indicated by radio that he was taking action. Sergeant Burks who was Officer Kelly's immediate supervisor, was in the vicinity and overheard the call. As a result, he drove by the parking lot. Upon observing that Officer Kelly had the situation under control, defendant Burks left the scene but returned a short time later.

The search of the female prisoners revealed that Elizabeth Jones possessed controlled substances. During the search, it also appeared that Ms. Jones had swallowed some of the pills which were found on her person.

Once Mr. Anderson and Mr. Moncus were transferred to the paddy wagon, Officer Pickering searched Mr. Moncus and found a small amount of what he believed to be marijuana in his shirt pocket. He then observed Mr. Anderson remove a bottle of pills from his right sock and pass the bottle to Mr. Moncus. Officer Pickering then went around to open the paddy wagon and discovered that the contents of the bottle, approximately 50 red and blue capsules, had been emptied onto the floor of the van. The pills were then confiscated. The female prisoners were placed in Officer Kelly's patrol car, which was searched. Numerous pills and capsules of various kinds were found under the seat. Shortly thereafter, Mr. Moncus passed out in the rear of the paddy wagon. Mr. Anderson informed the officers that Moncus had swallowed a number of tuonols, a barbiturate. He indicated to Officer Burks that Mr. Moncus and Ms. Jones, as well as himself, had taken pills.

Mr. Moncus was transported by ambulance to Grady Memorial Hospital for treatment. Ms. Nelson and Ms. Jones were transported to the detention center at Grady Memorial Hospital to receive sobriety tests in connection with their driving under the influence charges. On the way to Grady, Ms. Jones became unconscious in the back of Officer Kelly's patrol car. Mr. Anderson was the only detainee transported to the Atlanta Pre-trial Detention Center. Upon arrival at the pre-trial detention center, Officer Pickering gave custody of Mr. Anderson to the corrections intake officer, Michael Marshall. According to Officer Marshall, Officer Pickering told him that Mr. Anderson had taken a "large quantity of pills." Officer Pickering denied making the statement as well as having any knowledge that Anderson had used drugs.

Mr. Anderson was initially processed by Officer Marshall. During the intake process, Officer Marshall allegedly completed a medical screening form on Mr. Anderson and noted on the form that he was under the influence of drugs and had taken a large quantity of pills. Officer Marshall testified that Mr. Anderson told him that he was overdosing on drugs. The shift commander, Lieutenant Irvin, was present at the time Officer Marshall repeated to her that Mr. Anderson had stated that he was overdosing on drugs. She instructed Officer Marshall to make sure that he noted on Mr. Anderson's medical screening form that he was overdosing. Lieutenant Irvin further instructed Officer Marshall to put Mr. Anderson in a single cell and keep a close watch on him. Accordingly, Anderson was placed in a single cell. Another detainee was subsequently placed in the cell along with Mr. Anderson.

Mr. John Carl Weisgerber, a detainee at the pre-trial detention center that night, indicated that he saw Mr. Anderson and that he was obviously under the influence of drugs and that he heard Mr. Anderson tell the officers that he was sick and needed to go to the hospital.

Officer Marshall testified that he spoke to Mr. Anderson at 4:30 A.M. and again at 6:00 A.M. and that both Officer Marshall and his relieving officer, Tommy Smith, stated that they made Mr. Anderson get up and come to the door of his cell at 7:00 A.M. Doctor Stivers, the Fulton County Medical Examiner, testified, however, that Mr. Anderson in all likelihood died between 4:00 A.M. and 5:00 A.M. and that he was probably in a coma for some time prior to death. Mr. Anderson was found dead in his cell at approximately 9:25 A.M.

There are two issues on appeal: (1) Whether the trial court properly granted the City of Atlanta's and J.D. Hudson's motion for a judgment notwithstanding the verdict; and (2) Whether the trial court properly granted a new trial should this court not agree with its decision to grant a judgment notwithstanding the verdict.

## II. THE LEGAL ISSUES IN CONTEXT

A. *Did the District Court Properly Grant Defendants' Motion for Judgment Notwithstanding the Verdict*

1. *The district court's decision and the Standard of Review.*

The district court in granting defendants' motion for judgment notwithstanding the verdict stated:

> The court finds that there is no evidence of record to support 42 U.S.C. § 1983 liability against either defendant, J.D. Hudson, a supervisor with no personal participation, or the municipality itself, the City of Atlanta. All defendants having any actual participation in the incarceration of plaintiff's deceased had verdicts rendered in their favor. *See also Parratt v. Taylor,* 451 U.S. 527 [101 S.Ct. 1908, 68 L.Ed.2d 420] (1981).

In reviewing the district court's decision to grant the motion for judgment N.O.V., we must consider all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the inferences point so strongly and overwhelmingly in favor of the movant that reasonable persons could not have arrived at a contrary verdict, then the district court's decision to grant the motion was proper. *Dresco Mechanical Contractors, Inc. v. Todd-CEA, Inc.,* 531 F.2d 1292, 1296 (5th Cir.1976). If there was substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, then the district court's decision to grant the motion would be improper. *Boeing Company v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

2. *A review of the evidence.*

In this case we believe that the district court's decision to grant defendant's motion for judgment notwithstanding the verdict was erroneous. The evidence indicates the following. Several police officers testified that the pre-trial detention center was inadequately staffed and that it was very difficult to do one's job properly. For example, Officer Marshall testified that he often worked a double shift at both the new and old detention centers because "there was a shortage of officers." [3] (TR V at 66–67). Most importantly for the purpose of this case he testified that they were short four or five officers on his shift, i.e., 11:00 P.M. to 7:00 A.M., on January 3 and 4, 1983, when Larry Gene Anderson died at the pre-trial detention center. (TR V at 69). Additionally, he testified that he was in receiving alone that night because another officer assigned to receiving, Officer Snipes, was off doing someone else's job. (TR V at 77).

He testified that Officer Pickering, who brought Anderson to the detention center, informed him that Mr. Anderson had taken a large quantity of pills. (TR V at 72).[4] However, Officer Pickering denied having any knowledge that Mr. Anderson had taken any drugs and also denied making the statement to Officer Marshall. (TR IV at 57). However, Pickering did testify that Mr. Anderson appeared intoxicated. (TR IV at 69). Mr. Anderson also told Officer Marshall that he was overdosing on drugs and that he was sick and needed to go to the hospital. (TR V at 77 and 87). Marshall testified that he took no action because there was no medical staff present on that shift. (TR V at 80 and 89). Additionally, he testified that there was only one officer on duty on each floor in the pre-trial detention center on the night of January 3rd and 4th even though two offi-

---

**3.** He testified that he worked a double shift on the day of Mr. Anderson's death.

**4.** According to Officer Marshall's testimony, the screening form that Marshall filled out also indicated Mr. Anderson was under the influence of drugs and had said he was overdosing. However, the form itself could not subsequently be located. Director Hudson disputed whether Marshall ever in fact filled it out. (TR VI at 373).

cers were required.[5] Finally, he indicated that it was very busy and hectic that evening and due to the shortage of staff it was impossible to check on the inmates as often as needed. (TR V at 90).

Lieutenant Sarah B. Irvin, the shift commander that evening, testified that no medical staff worked on her shift from 12:00 A.M. to 7:00 A.M. (TR V at 116). She testified that the medical staff's shift ran only until midnight, thus, they had "only an hour's coverage." (TR V at 106) (*See infra* slip op. pg. 1220, pg. 684 for further discussion). Further, she testified that there were not enough officers on duty and that four to six more officers could have been used for the shift. (TR V at 117). It was her belief that more officers were needed in the new jail due to its size. (TR V at 116). She stated that she had received complaints from officers on her shift regarding the understaffing and that she had spoken to her supervisors about the need for more personnel and that she finally quit asking because "it was like whipping a dead horse." (TR V at 116–117). She also testified that it is standard operating procedure for her, as shift commander, to check on every detainee at least once during her shift but that she was not able to check on Mr. Anderson. (TR V at 123).

Officer Tommy Smith testified that at times on his shift, i.e., 7:00 A.M. to 3:00 P.M., there were as few as sixteen officers working when approximately 25 were required. (TR V at 171). In fact, he stated they were short of staff most of the time. (TR V at 172). He further testified that the 11:00 P.M. to 7:00 A.M. shift is normally one of the busiest shifts. (TR V at 172). At the new pre-trial detention center the work required on this shift was very strenuous because the facility was much larger and that they "came over to the new facility with the same amount of" understaffing. (TR V at 172). The shortage of staff,

according to Smith, made it impossible to check on the detainees every half-hour as required. (TR V at 176). He also asserted that he had complained about understaffing at the Pre-trial Detention Center but felt that "it was like a voice crying in the wilderness." (TR V at 172–173). He further testified that there was a shortage of people on his shift beginning at 7:00 A.M. on January 4, 1983, the morning when Mr. Anderson was found dead in his cell. (TR V at 176).

Plaintiff also called two expert witnesses. Dr. Paul Siehl, a physician employed by Correctional Medical Systems, testified regarding minimum health care standards at jails. Essentially he testified that if a correctional officer knows or has reason to believe that a detainee has taken a large quantity of drugs, he should immediately notify the health care provider to examine the patient.[6] (TR IV at 37–38). William Alexander was also called. He was employed by Correctional Medical Systems as a director of operations overseeing the health care in a number of correctional institutions in Georgia. (TR IV at 40–41). The Fulton County Jail was one of the facilities. (TR IV at 41). He testified that if an individual detainee states that he is overdosing on drugs, the person needs to be referred to someone who can properly evaluate the complaint, preferably medical personnel at the facility. If none is available, the detainee should be referred to a community hospital or an outside facility where health care can be provided. (TR IV at 45–57). Mr. Alexander testified for plaintiff under subpoena and not voluntarily. (TR IV at 47).

Thomas J. Pocock, the deputy director of the Bureau of Corrections with specific responsibility for the Detention Center, also testified. (TR VI at 346). He stated that if the screening officer, upon observing the physical appearance of the prisoner, detects no serious illness or injury, then the

---

**5.** This is verified by the testimony by Mr. Carl Weisgerber. He testified that the only guard on the floor was in a soundproof booth.

**6.** He testified that medical personnel would include a physician, physician's assistant, registered nurse, LPN or medical assistant clinician. (TR IV at 36).

prisoner is admitted to the facility. (TR VI at 352). He testified that the jail had a minimum staffing level of twenty personnel per watch, irrespective of food service personnel, medical personnel, etc. (TR VI at 363). He further testified that there were twenty persons on duty the night Mr. Anderson died. (TR VI at 364). Additionally, he maintained that in obtaining federal funds for the new facility, the City had to accommodate various aspects of the new jail, including staffing to meet certain standards. (TR VI at 365). Thus, he stated strongly that the jail was adequately staffed on January 4, 1983. (TR VI at 370).

J.D. Hudson, Director of Bureau of Corrections for the City of Atlanta, testified that as Director of the Bureau of Corrections, he established the formal policies of the City of Atlanta to insure the health and safety of the inmates. (TR V at 244). According to his testimony, the minimum number of officers required on any given shift at the Atlanta Pre-trial Detention Center was 23.[7] (TR V at 216). He also testified that it was his belief that the average number of officers on duty at the pre-trial detention center on any given shift was 13. (TR V at 217). Director Hudson, however, did not at any time admit that the jail was understaffed. He testified, "[t]he jail that we operate is a state of the art. We have adequate staff that has been trained and retained.... We have some of the best officers, the most professional officers in the country, and one of the best jails in the country. It is not understaffed." (TR V at 217).

He did indicate, reluctantly, that he had received complaints from officers that more personnel was needed. (TR V at 222). Furthermore, Standard Operating Procedure No. 81–10–SOP–BCS, issued and signed by him as director, set out the duties to be performed by the health care provider during all shifts, including the 11:00 P.M. to 7:00 A.M. shift; however, no health care provider was required to be at the center on the 11:00 P.M. to 7:00 A.M. shift. Medical personnel were on call, either by beeper or phone. (TR VI at 239). The standard operating procedures and special orders issued by Hudson further called for a full complement of staffing of health care personnel at the Pre-trial Detention Center on a 24 hour, seven day a week basis. (TR VI at 243). A nurse was required to be on duty to make a visual observation of each detainee brought into the Pre-trial Detention Center to assess normal appearance and conditions versus abnormal appearance and to inspect the detainee's physical anatomy. (TR VI at 249). However, no nurse was ever hired to perform these duties on the 11:00 P.M. to 7:00 A.M. shift.[8] (TR VI at 250–251). Mr. Hudson further testified that part of the standard operating procedures required for the detention areas to be checked every 30 minutes for the health and well-being of the detainees. (TR VI at 243).

Carl J. Weisgerber, who was a detainee at the Pre-trial Detention Center at the time of Mr. Anderson's death, testified that he tried to explain to the duty officer on the 11:00 P.M. to 7:00 A.M. shift that he was on heart pills and needed to see a doctor or nurse but was continually told that he would have to wait. (TR V at 189). He also testified that he overheard an officer complain to another officer that he was the only one on the floor and could not do the entire job himself.

Most importantly, for the purposes of this case, he testified that he saw Mr. Anderson that night at the Detention Center and that he could not walk without the support of the officers and that Mr. Anderson told the officers that he was having

---

**7.** However, he stated the question was best asked of Mr. Pocock, who was in charge of day-to-day operation of the jail. (TR VI at 216).

**8.** Mr. Hudson did testify that shift Sergeant Sharon Green Pope, who was a licensed emergency medical technician and thus "a health care provider" within the meaning of the standard operating procedures and special orders, was frequently the assistant supervisor of the night watch. She was not on duty the night of Larry Gene Anderson's death. (TR VI at 250–251).

trouble seeing and that he was sick and needed to go to a hospital. (TR V at 185). He further indicated that it was obvious from Mr. Anderson's looks that he was heavily under the influence of drugs and that he could not stand alone, his eyes were very red, and he was slobbering. (TR V at 185). Additionally, he testified that the officers were complaining about the lack of personnel and that they could not do their jobs properly. (TR V at 190).[9]

The Fulton County Medical Examiner, Doctor Stivers also testified at trial. He stated that Mr. Anderson could have lived from the amount of drugs that he ingested. His testimony was that Mr. Anderson died at approximately 4:00 A.M. from acute barbiturate intoxication. (TR V at 141). His death was in all probability preceded by at least some period in a coma. (TR V at 143). Despite the officers' testimony that they checked on Mr. Anderson at 4:30 A.M. and at 6:00 A.M., his testimony indicated that this was unlikely. He did not believe that Mr. Anderson could have spoken or stood up at these times. (TR V at 145). This testimony was based upon his examination and autopsy of Larry Gene Anderson. Mr. Anderson was not found dead in his cell until about 9:25 A.M. At this time, full rigor mortis and lividity had set in and Dr. Stivers stated that this process took at least several hours after death. He placed the time of death somewhere between 4:00 A.M. and 5:00 A.M. (TR V at 145).

### 3. *Municipal liability.*

■ The Supreme Court recently reiterated in *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that a municipality cannot be subjected to § 1983 liability "based upon theories akin to *respondeat superior.*" *Tuttle, supra,* 105 S.Ct. at 2433. Thus, only deprivations arising from municipal custom or policy can result in municipal liability. *Id.; see also Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1503 (11th Cir.1985) (en banc). When an injury is inflicted as the result of governmental policy or custom, the government is responsible under § 1983. *Monell, supra,* 436 U.S. at 694, 98 S.Ct. at 2037.

■ A policy or custom generally applies to a course of action chosen from among various alternatives. Furthermore, at a minimum, a plaintiff must demonstrate some affirmative link between the policy and the particular constitutional violation alleged. *Tuttle, supra,* 105 S.Ct. at 2436.[10] *See also Williams v. Bennett,* 689 F.2d 1370, 1380–81 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

### 4. *The standards applied.*

■ Contrary to appellees' assertions, the verdict against the City in this case was not based upon single incident liability. A municipality can generally not be liable for a single act of negligence or misconduct. *See Tuttle, supra; Gilmere, supra* (no municipal liability where failure properly to train one police officer is not attributable to city policy or custom). If the City's evidence had shown that the jail was understaffed on the evening in question as an isolated event, this case would be within the parameters of *Tuttle, supra.* However, the jury instruction specifically required the jury to find a pattern or practice of incidents of indifference. There was sufficient proof here to support such a finding. Several officers testified that understaffing was a persistent problem and that complaints had been lodged with their supervisors, including J.D. Hudson. Certainly this is sufficient to show a custom or policy of understaffing. Furthermore, the

---

**9.** Mr. Pocock testified that he did not believe, based upon the physical layout of the Detention Center, that it would have been possible for Weisgerber to have seen Anderson. (TR VI at 357–59).

**10.** In *Monell, supra,* the Court stated: "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," the city may be liable. 436 U.S. at 694, 98 S.Ct. at 2037.

evidence was sufficient to show an affirmative link between the policy and the death of Mr. Anderson.[11]

The district court stated that there could be no municipal liability in this case because the jury absolved all the individual officers having contact with Mr. Anderson. However, we conclude that the jury's findings are not inconsistent. *Monell, supra,* and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government. As the Tenth Circuit recently noted:

> [t]he language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell,* 436 U.S. at 692 [98 S.Ct. at 2036]. Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Garcia v. Salt Lake County,* 768 F.2d 303, 310 (10th Cir.1985) (quoting *Monell, supra*).

Furthermore, if the jury were to find, as it did, that the deprivation of Mr. Anderson's constitutional rights was a result of understaffing, then it would logically find no fault on the part of the individual arresting officers. The jury could reasonably find that a policy of understaffing resulted in the unavailability of medical personnel and prevented individual officers from being able to do their tasks properly. Any injury or deprivation legally caused by the lack of adequate staffing would not necessarily render jail personnel or arresting officers liable. We see no inconsistency in the jury verdict holding the City liable and the individual officers not liable.

The City also asserts, relying upon *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), that this case is not properly the subject of a § 1983 action. The district court in a cryptic reference also mentioned *Parratt.* In *Gilmere, supra,* the en banc court made clear that *Parratt* does not extend to actions alleging violations of substantive due process rights or rights protected by specific constitutional guarantees. Since plaintiff alleged and proved in this case that the defendants deprived Mr. Anderson of his right to life through deliberate indifference to serious medical needs while detaining him in a jail, this is a proper § 1983 cause of action.

Using these standards, the above summary of the testimony and proof at trial indicates that there was certainly enough evidence to permit the jury to return a verdict against Director Hudson and the City of Atlanta that was not founded upon *respondeat superior.* There was sufficient evidence for the jury to find that Director Hudson, whose acts may be fairly said to represent official policy of the City of Atlanta, knew that the Pre-trial Detention Center was inadequately staffed and that it was difficult for the officers to perform their jobs properly. Thus, it was possible for the jury to decide that there was a conscious decision on the part of Director Hudson and therefore, the City of Atlanta, not to increase the staff at the Detention Center in the face of complaints of inadequate staffing. The result of this decision was that officers were unable to perform their jobs properly. Furthermore, the jury could have found that Director Hudson and the City of Atlanta knew or should have known that the natural consequence of this failure to adequately staff the jail would impair proper medical care and attention necessary to protect the health of pre-trial detainees.[12]

---

**11.** Contrary to the City's position, the relevant authorities do not require a plaintiff to show a prior accident resulting in injury. A pattern or practice of understaffing is sufficient, regardless of whether it previously resulted in injury to an inmate.

**12.** Deliberate indifference to serious medical needs is a tort of constitutional dimension. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Pretrial detainees are entitled to the same, if not greater, medical care as are convicted inmates. *See Ancata v. Prison*

In sum, there was sufficient proof to support the jury's conclusion that if the City of Atlanta had not utilized a custom, policy, pattern and/or practice of inadequately staffing the Pre-trial Detention Center, thus making it difficult for the officers to tend to the medical complaints of detainees, Larry Anderson would not have died in the Fulton County jail.

Furthermore, the court went to great length in its charge to the jury to instruct them as to the degree of proof necessary to determine whether the City of Atlanta and Director Hudson were legally liable to plaintiff.[13] The relevant section of the instructions stated:

Now, a supervisory official, such as defendants George Napper and Hudson, can be liable under the laws which we are concerned with only where there is some personal involvement on the part of that official in the acts which resulted in the constitutional deprivation or where the misconduct was executed pursuant to an official policy or an informal practice promulgated by that supervisor.

Now, I charge you that even if there were employees of the City of Atlanta who were grossly negligent and such gross negligence resulted in the death of Larry Gene Anderson, even so you may not impute that gross negligence to the City for the purpose of determining that the City of Atlanta was liable for Mr. Anderson's death because a municipality is not liable under these civil rights acts for negligence unless it is established that there was a pattern of instances similar to that which resulted in decedent's death which existed or that serious incompetence or misbehavior was general and widespread.

Now, a custom is a persistent practice of officials which is so well settled that it has the same force as a legislative pronouncement, requiring a showing of settled government practice or deeply embedded ways of carrying out city policy. They cannot—that is, a city cannot be held liable for an injury inflicted solely by its employees or agents. It is only when that—when the execution of the government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the municipality may be held liable.

In order for the plaintiff to prove that a municipal policy or practice caused a constitutional violation, the plaintiff must prove an affirmative link between the various incidents of policy misconduct and the adoption of any plan or policy by the municipality or supervisory official showing their authorization or approval of such misconduct. The mere understaffing, without more, is not proof of such practice, policy, or custom. It would become so only if a more complete staffing were possible financially or otherwise, and that it was the deliberate intent of the policy making officials not to adequately staff the hospital, having in mind a gross indifference to the needs of the prospective prisoners for medical attention.

There may be many reasons for an understaffing of a municipal or a governmental facility; finances, the finding of persons's [sic] causes too numerous for the court to mention, but to establish the type of policy which you must establish—find established here by a preponderance of the evidence introduced by the plaintiff is a policy coupled or having as an ingredient of that the conscious

---

*Health Services, Inc.,* 769 F.2d 700, 703 n. 5 (11th Cir.1985). Deliberate indifference to serious medical needs may be shown by proving a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care. *Ancata, supra; see also Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir.1985); *Ramos v. Lamm,* 639 F.2d

559, 578 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

**13.** In *Tuttle, supra,* the Court in part relied upon the inadequacy of the jury instruction in reversing a finding of municipal liability. 105 S.Ct. at 2435. The instruction here, however, correctly stated the applicable law.

indifference to the needs of prisoners for the adequate medical attention.[14] (TR VII at 458–460). The court also prepared special interrogatories for the jury's use during deliberations. The jury was instructed to pay strict attention to the wording of each interrogatory and further to answer each interrogatory "yes" or "no" based upon the evidence presented at trial. The court conferred with counsel for both defendants and plaintiff in preparing these special interrogatories and defendants tendered no objection.

The interrogatory pertaining to defendant Hudson read:

> With respect to the supervisory officials, one, do you find from a preponderance of the evidence that Larry Gene Anderson was denied necessary medical care due to misconduct pursuant to or in furtherance of an official policy or informal practice intentionally promulgated by an individual defendant below. Commissioner George Napper, Yes, or No; Director Hudson, Yes or No; Police Chief Morris Redding, Yes or No. If your answer is "Yes" as to any defendant then you must answer the following question as to him. Do you find from a preponderance of the evidence that the individual defendant knew or should have known that their individual conduct would invade Larry Gene Anderson's settled legal rights to necessary medical care and therefore is not entitled to good faith immunity from liability. That "there" [sic] up there should be "his." The sequence is wrong but I think you will understand the question. Commissioner George Napper, Yes or No; Director Hudson, Yes or No; and Police Chief Morris Redding, Yes or No.

The special interrogatory pertaining to the City of Atlanta stated very clearly the degree of proof necessary to find liability on the part of the City. Nothing in the interrogatory mentioned liability under *re-spondeat superior* principles. The interrogatory states:

> Do you find from a preponderance of the evidence that the City of Atlanta through its supervisory officials, whose acts may fairly represent official policy, deprived Larry Gene Anderson of his legal right to necessary medical care by an established pattern or practice showing deliberate indifference or tacit authorization of the wrongful conduct?

To this the jury unanimously answered, "Yes."

Because the evidence was sufficient to support plaintiff's position and the jury was properly instructed and given special interrogatories containing the proper standards of liability, we conclude that the district court improperly granted the defendant City's motion for a judgment notwithstanding the verdict.

5. *The punitive damages award against J.D. Hudson.*

██ However, we affirm the district court's decision to grant a judgment notwithstanding the verdict in one respect, the punitive damages award against J.D. Hudson. Generally, before an award of punitive damages is authorized in a civil rights action the jury must find, and the evidence must support its decision, that the defendant was motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights. *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Consistent with *Smith v. Wade,* the district court instructed the jury:

> The function of [punitive damages] is to punish the defendants for malicious or grossly wrong [conduct] and to deter similar [conduct] by others. Whether you decide to award punitive damages should be based upon whether or not you find that the defendants have been will-

---

**14.** Although not at issue in this case, we note our disapproval of parts of this instruction given, most especially the references to the fact that lack of finances may be a permissible reason for understaffing. Lack of funds for facili- ties cannot justify an unconstitutional lack of competent medical care or treatment of inmates. *See Newman v. State of Alabama,* 559 F.2d 283, 286 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160.

ful or malicious in their violation of plaintiff's constitutional rights, or that their acts were intentional in gross disregard of his constitutional rights.

(TR VII at 462).

 The evidence offered by plaintiffs in this case does not support an award of punitive damages. There was no evidence that Director Hudson had an evil motive to infringe upon Mr. Anderson's constitutional right to life or that his actions were so egregious as to constitute reckless or callous indifference. Therefore, the award of punitive damages cannot stand.

### B. *The District Court's Decision to Grant a New Trial.*

 In the district court's order he stated that in the event that the Eleventh Circuit did not agree with his decision to grant a judgment notwithstanding the verdict he would grant defendant's motion for a new trial because he believed that "the verdict was based principally on adverse reaction by the jury to the defendant Hudson's impatient and defensive demeanor while on the stand rather than to the substance of his testimony or any other evidence of record—in other words, that he antagonized the jury." [15]

 J.D. Hudson was not only a witness but a defendant. He was called as a witness by plaintiff for the purpose of cross-examination in order to make out plaintiff's case. In any case of this nature, many of the witnesses that a plaintiff will have to use will necessarily be correctional officers and supervisory personnel, as was Director Hudson. Thus the jury must pay close attention to the witnesses and judge them not only by their responses to the questions but by their demeanor, credibili-

ty, appearance, etc. Furthermore, in this case the judge specifically instructed the jury to that effect:

> You may be guided by the appearance and the conduct of the witness, the manner in which the witness testifies, the character of the testimony given or by evidence to the contrary. You should carefully scrutinize all the testimony given as I have said and consider each witness's intelligence, motive, state of mind, demeanor and manner while on the stand. Consider also any relation each witness may bear to either of the side[s] of the case, the manner which each witness may be affected by the verdict, and the extent to which, if at all, he is either supported or contradicted by other evidence in this case.

(TR VII at 468–469). This is a standard jury charge in a case of this nature, and properly so. A review of his testimony does indicate that Hudson was defensive and evasive on the stand. However, our review of the record does not indicate his conduct was so egregious that it both antagonized and influenced the jury to render a verdict adverse to the City. Rather as we have indicated in our discussion of the trial court's decision to grant defendant's motion for judgment notwithstanding the verdict, there was sufficient evidence upon which a properly instructed jury could return a verdict against the City, which it did. Therefore, the decision of the district court to grant defendant's motion for a new trial is reversed.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**15.** Generally, a district court's decision to grant a motion for a new trial is not appealable. However, if an appeal is properly taken from a judgment notwithstanding the verdict, the appellate court, on holding that the J.N.O.V. was erroneous, has the power to review a conditional order of the trial court granting a new trial. Fed.R.Civ.P. 50(c); *see also* Wright & Miller, *Federal Practice and Procedure,* § 2818, at 115. In this case the district court alternatively granted the motion for a new trial because it believed that Hudson antagonized the jury. When the district court grants a new trial for reasons unrelated to the weight of the evidence but rather having to do with what it believes to be some "distortion" in the trial process, then we review the district court's decision only for abuse of discretion. *O'Neil v. W.R. Grace & Co.,* 410 F.2d 908 (5th Cir.1969).