[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13994

_____

JESSICA N. ROGERS,
As personal representative of the estate of Jose F. Escano-Reyes and
as parent and natural guardian of Y.C., a minor child,

Plaintiff-Appellee,

_versus_

SHERIFF OF SANTA ROSA COUNTY, FLORIDA,
In his official and individual capacity,

Defendant-Appellant,

JOHN GADDIS,
In his official and individual capacity,

                                                      Defendant,

MICHELLE BAUMAN,
In her official and individual capacity,

                                                      Defendant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:18-cv-00571-TKW-EMT

_____

Before LAGOA and BRASHER, Circuit Judges, and BOULEE,* District Judge.

BOULEE, District Judge:

This case arises from the suicide of an inmate, Jose Francisco Escano-Reyes, at Florida's Santa Rosa County Jail. Jessica Rogers, the mother of Escano-Reyes' minor child, brought claims under 42 U.S.C. § 1983 against John Gaddis and Michelle Bauman, deputies

_____

*Honorable J. P. Boulee, United States District Judge for the Northern District of Georgia, sitting by designation.

employed the Santa Rosa County Sheriff's Office, alleging deliberate indifference to medical needs in violation of the Fourteenth Amendment. Rogers also sued Bob Johnson, the Sheriff of Santa Rosa County, in his official capacity under § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), asserting that the suicide-monitoring practices at the Santa Rosa County Jail violated Escano-Reyes' constitutional rights. The matter proceeded to trial.

After Rogers rested her case, the Sheriff moved for judgment as a matter of law on the grounds that the evidence failed to show that the Jail's policies, practices, or customs were deliberately indifferent to the risk of suicide. The district court denied the motion. After the evidence closed, the jury determined that the deputies were not liable under § 1983. More specifically, the jury found that the deputies were aware of and deliberately indifferent to the risk that Escano-Reyes would commit suicide but that their deliberate indifference did not cause his death. The jury found that the Sheriff, however, was liable under *Monell*.

Following the verdict, the Sheriff renewed his motion for judgment as a matter of law, again asserting that the evidence was insufficient to show that the Jail's policies, practices, or customs were deliberately indifferent to the risk of suicide. The Sheriff moved in the alternative to amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Without a finding that the deputies were individually liable under § 1983, the Sheriff argued that Rogers' *Monell* claim necessarily failed and that he should be

removed from the judgment as a liable party.  The district court denied relief on both grounds.

Upon *de novo* review, we find sufficient evidence in the record showing that the Jail's policies constituted deliberate indifference to the risk that Escano-Reyes would commit suicide.  Moreover, we have previously considered the question of whether individual liability under § 1983 is a necessary component of *Monell* liability, and in *Barnett v. MacArthur*, 956 F.3d 1291, 1301 (11th Cir. 2020), we held that it is not.  In light of *Barnett*, the district court did not abuse its discretion by denying relief under Rule 59(e).  With the benefit of oral argument, we affirm the district court on all grounds.

## I.    FACTUAL BACKGROUND

### A.  Escano-Reyes' Arrest and Detention

On January 3, 2016, the Okaloosa County Sheriff's Office arrested Escano-Reyes for driving without a license.  Escano-Reyes, a Honduran citizen, was in the country illegally, and on January 7, 2016, he was placed in the custody of the Santa Rosa County Sheriff's Office and detained at the Santa Rosa County Jail (the "Jail") pending removal proceedings.

Escano-Reyes' mental health deteriorated while in custody, and on April 2, 2016, he informed Jail officials that he wanted to die and planned to kill himself.  Medical staff at the Jail transferred Escano-Reyes to the medical unit and placed him on a suicide-watch protocol.  Inmates on suicide watch are provided with a

suicide-prevention garment, or "suicide smock." Suicide smocks are ordinarily stiff and unpliable but can become more flexible with time and wear. Escano-Reyes was provided with a suicide smock; however, the Jail did not evaluate the condition of the smock given to Escano-Reyes, nor did it know how old the smock was.

## B. The Jail's Suicide-Watch Protocol

The Jail's suicide-watch protocol requires supervising deputies to comply with a number of the Jail's written policies. The Jail's standard operating procedure, for example, provides that suicidal inmates must be under "direct visual observation by a deputy/nurse 24 hours a day." The Florida Model Jail Standards, with which the Jail must comply, define "direct observation" as "continuous visual observation 24 hours each day." Additionally, supervising deputies at the Jail are expected to follow General Order O-030II(D), which requires suicidal inmates who are housed in a single cell to be "under direct continuous observation with documented staggered 15-minute physical checks." Deputies must complete a close-watch form to certify that they checked on the inmate in question every fifteen minutes. Jail staff are expected to comply with the suicide-watch protocol whether the inmate is housed in the medical unit or elsewhere.

In reality, though, the Jail followed certain customs and practices for monitoring suicidal inmates that differed from these written policies. For instance, the Jail did not require deputies to continuously or directly observe a suicidal inmate to confirm his safety, nor did the Jail require deputies to physically walk to the

6                    Opinion of the Court                    21-13994

door of an inmate's cell to look inside the window and check on him.  Instead, being in the general area of the inmate such that the deputy was "available" and "capable" of performing the staggered fifteen-minute check was deemed sufficient.  The Jail also considered a solely visual check to constitute an adequate physical check on the inmate's safety.  More specifically, a deputy, even if seated some distance away, could comply with the Jail's customs by glimpsing some part of an inmate through the exposed portion of a cell window.

Suicidal inmates who were disruptive to the medical staff were often moved to the Admissions, Classification, and Release ("ACR") Unit.  Cell one of the ACR unit, or ACR-1, was the only cell in the ACR unit with a metal partition on which a ligature could be fastened; nonetheless, ACR-1 was used to house suicidal inmates.  ACR-1 was not far from the Jail's booking desk, but the deputies who monitored the ACR unit from that desk had only an obscured view of ACR-1.  The Jail covered the main windows of the ACR cells (including ACR-1) with curtains and the bottom half of the cells' smaller windows, which were positioned along the length of the door, with plastic bags.[1]  In sum, curtains and bags concealed much of ACR-1's interior from outside view.  That, combined with the cell's position relative to the Jail's booking desk,

---

[1] The Jail explained that the purpose of this practice was to conceal, particularly from the view of female deputies, inmates who were naked or masturbating.

meant that a deputy would have to physically walk to the door of ACR-1 and look through the portion of the smaller windows left uncovered to see fully inside the cell.  The Jail's booking desk and the interior of ACR-1 were recorded by video cameras and audio equipment, but the video feed inside ACR-1 was not visible from the booking desk.  Instead, that video feed was displayed in a central control room where one person watched hundreds of other monitors.

### C.  Escano-Reyes' Suicide

On April 6, 2016, following a period of erratic behavior, Escano-Reyes—who remained on suicide watch—was moved from the medical unit to the ACR unit, where he was housed in ACR-1.  On April 7, 2016, around 6:45 AM, deputies Gaddis and Bauman began their shifts at the Jail.  During their daily briefing that morning, Gaddis and Bauman were informed that Escano-Reyes was on suicide watch and that they were responsible for supervising him.

Video footage from inside ACR-1 shows that Escano-Reyes woke up on April 7, 2016, around 8:15 AM.  Forty-five minutes later, he removed his suicide smock and tied it into a knot around the cell's metal partition.  He removed the smock from the partition a few minutes later and put it on before, again, taking it off and tying the smock to the partition to create a ligature.  Naked and agitated, Escano-Reyes then paced his cell while yelling in Spanish. The deputies could hear him shouting for over an hour, but

8                    Opinion of the Court                    21-13994

because they did not speak Spanish, they could not understand what he was shouting.[2]

The close-watch form for Escano-Reyes on April 7, 2016, has fifteen entries.  At trial, Gaddis admitted that he falsified the close-watch form by documenting checks—specifically, the first five entries—that he did not, in fact, perform.  The next two entries indicate that a deputy checked on Escano-Reyes and that he was lying down.  Five entries have a code that Escano-Reyes was "shouting," but notably, the Jail did not permit solely auditory checks.  The final three entries on the close-watch form, at 9:32 AM, 9:45 AM and 10:00 AM, read "DOOR," presumably indicating that the deputies could see flashes of movement through the exposed portion of ACR-1's window, pursuant to the Jail's policy of permitting solely visual checks.  Importantly, Gaddis and Bauman remained seated at the booking desk between 9:30 AM and 10:25 AM.  At no point during this period did either deputy physically walk to the door of ACR-1 to check on Escano-Reyes.

Between 9:30 AM and 10:25 AM, Escano-Reyes placed his head into the ligature created with the suicide smock at least five times.  He tried to hang himself at least nine times.  At 10:25 AM, Escano-Reyes was able to hang himself.  His body was not discovered for twenty minutes.  At 10:45 AM, a member of the Jail's janitorial staff walked by Escano-Reyes' cell, looked through the

---

[2] Although the Jail recorded audio and video of ACR-1, the audio portion of the recording from April 7, 2016, is unavailable.

21-13994                Opinion of the Court                9

portion of the exposed window and informed the deputies that Escano-Reyes was "hanging."

## II.    PROCEDURAL HISTORY

Rogers filed an action in the Northern District of Florida as the personal representative of Escano-Reyes' estate and on behalf of her and Escano-Reyes' minor child.  Rogers brought claims under 42 U.S.C. § 1983 and the Fourteenth Amendment for deliberate indifference to serious medical needs[3] against Gaddis and Bauman in their individual capacities and a § 1983 claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against the Sheriff of Santa Rosa County in his official capacity.[4]  Rogers also brought state-law claims for negligence against Gaddis and Bauman.  The Sheriff moved for summary judgment, as did the deputies on the grounds of qualified immunity.  The district court denied both motions.[5]

---

[3] There is no dispute in this case that inmates on suicide watch have a serious medical need.

[4] Because "a suit against a public official in his official capacity is considered a suit against the local government entity he represents," *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989), we refer to "the Sheriff" and "the Jail" interchangeably in this opinion.

[5] The deputies filed an interlocutory appeal of the denial of qualified immunity, and we affirmed the district court's ruling.  *See Rogers v. Santa Rosa Cnty. Sheriff's Off.*, 856 F. App'x 251, 256 (11th Cir. 2021).

Rogers' § 1983 claim against the Sheriff (and her § 1983 and state-law claims against Gaddis and Bauman) proceeded to a jury trial.  Rogers presented evidence that the Jail had the following policies:  (1) permitting the covering of two of the three windows of ACR-1; (2) housing suicidal inmates in ACR-1, although the cell contained a metal partition and its interior could not be fully viewed from the Jail's booking desk; and (3) allowing deputies to perform visual checks on suicidal inmates by glimpsing the inmate through a cell window while the deputy remained seated at the booking desk.[6]

Both parties presented witnesses to provide evidence about the Jail's policies.  Captain Barbara Stearns testified as the representative of the Jail.  James Upchurch, a corrections professional with a forty-five-year career and the former Assistant Secretary of Institutions for the State of Florida, testified as an expert for Rogers.[7]

Stearns testified that placing a suicidal inmate in a cell with partially concealed windows impeded adequate monitoring and posed an obvious risk.  Stearns conceded that the Jail followed certain practices when monitoring suicidal inmates that differed from its written policies, specifically regarding the obligation to provide direct and continuous observation of inmates on suicide watch.

---

[6] We refer to these three practices as "the Jail's policies."

[7] The Sheriff did not proffer an expert witness.

Stearns also explained that under the Jail's policies, a "physical" check on an inmate could occur if a deputy, even one seated some distance away, simply glimpsed some part of the inmate through a cell window.

Upchurch opined that placing a suicidal inmate in a cell with a metal partition (like the one in ACR-1) and obstructing the windows of cells used to house suicidal inmates did not show regard for human life. According to Upchurch, permitting deputies to monitor inmates from a distant seated position—rather than requiring direct, continuous observation—would have "negative consequences" for preventing inmate suicide. Similarly, Upchurch explained, allowing checks that consisted solely of momentarily seeing the inmate through a window were not only insufficient to ensure the inmate's safety but dangerous as a matter of practice.

After Rogers rested her case, the Sheriff moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure, arguing that none of the Jail's policies were unconstitutional. The district court found sufficient evidence in the record to support a jury finding that the Jail's policies were deliberately indifferent to the risk that Escano-Reyes would commit suicide, and thus the court denied the Sheriff's motion. The deputies also moved for judgment as a matter of law, and the district court likewise denied their motions. The jury returned a verdict for Rogers

on the *Monell* claim and for the deputies on the individual § 1983 claims.[8]

Although the verdict as to Gaddis and Bauman is not on appeal, some of the jury's findings specific to the deputies (such as the jury's answers on the verdict form) are relevant to our analysis of the Sheriff's liability under *Monell*. We thus review those findings now.

To find Gaddis or Bauman liable under § 1983, the verdict form required the jurors to conclude that (1) Gaddis or Bauman had subjective knowledge of the risk that Escano-Reyes would commit suicide; (2) Gaddis or Bauman were deliberately indifferent to that risk; and (3) their deliberate indifference caused his suicide. Therefore, the jury had to answer "yes" to all three of these questions to find that either Gaddis or Bauman were individually liable under § 1983. However, to reach the issue of the Sheriff's liability under *Monell*, the verdict form only required the jurors to answer "yes" to questions one and two: that Gaddis or Bauman (1) had subjective knowledge of the risk that Escano-Reyes would commit suicide and (2) were deliberately indifferent to that risk.

In the end, the jury answered "yes" to questions one and two on the verdict form. In other words, the jury found that Gaddis and Bauman had subjective knowledge of the risk that Escano-

---

[8] The jury found for Rogers on the state-law claims against Gaddis and Bauman and awarded her $1,762,500 in damages.

Reyes would commit suicide and that they were deliberately indifferent to that risk. However, the jury did not find that their deliberate indifference caused Escano-Reyes' death and therefore determined that Gaddis and Bauman were not liable under § 1983. But the jury made the requisite finding on the verdict form to address the Sheriff's liability under *Monell*, and as we noted, it returned a verdict for Rogers on that claim.

After trial, the Sheriff renewed his prior motion for judgment as a matter of law under Rule 50(b). In the alternative, the Sheriff sought relief under Rule 59(e), asking the district court to remove him from the judgment. Before these motions were decided, the Sheriff timely appealed to this Court.

In his Rule 50(b) motion, the Sheriff argued that Rogers failed to introduce evidence that the Jail's policies were deliberately indifferent to a known or obvious risk of suicide. The Sheriff contended that he should otherwise be removed from the judgment under Rule 59(e). According to the Sheriff, the jury's finding that Gaddis and Bauman were not individually liable under § 1983 constituted a determination that Escano-Reyes' constitutional rights were not violated. And without a constitutional violation, the Sheriff argued, an element of *Monell* liability was missing, and the judgment should be amended to remove him as a liable party. The district court denied relief, finding "no basis . . . to set aside the verdict or the resulting judgment against the Sheriff under Rule 50(b) or Rule 59(e)." The Sheriff then amended his notice of appeal to include the denial of his post-trial motions.

### III.    STANDARDS OF REVIEW

#### A.  Judgment as a Matter of Law

"A Rule 50 motion for judgment as a matter of law is reviewed *de novo*, and this Court applies the same standards employed by the district court." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).  "In deciding a motion for judgment as a matter of law, we review all the evidence, drawing all reasonable inferences in favor of the nonmoving party." *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012).  However, "the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel*, 210 F.3d at 1337.  Accordingly, granting a motion under Rule 50 is only "proper when the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law." *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006).

#### B.  Amending a Judgment

"We review the denial of a Rule 59 motion for abuse of discretion." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007).  Importantly, "Rule 59(e) allows courts to alter judgments only where there is 'newly-discovered evidence or manifest errors of law or fact.'" *Samara v. Taylor*, 38 F.4th 141, 149 (11th Cir. 2022) (quoting *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1349 (11th Cir. 2016)).

## IV.    ANALYSIS

### A.  The Sheriff's Motions for Judgment as a Matter of Law

The Sheriff contends that the evidence at trial failed to show that the Jail's policies constituted deliberate indifference to a known or obvious consequence of suicide.  He thus claims that the district court should have granted his motions for judgment as a matter of law.  Having reviewed the evidence *de novo*, we do not agree.

To succeed on a § 1983 claim under *Monell*, a plaintiff must prove, by a preponderance of the evidence, "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see also Monell*, 436 U.S. at 694.  In a jail suicide case, a § 1983 claim under the Fourteenth Amendment requires the plaintiff to show that the defendant "displayed 'deliberate indifference' to the prisoner's taking of his own life." *Edwards v. Gilbert*, 867 F.2d 1271, 1274–75 (11th Cir. 1989).  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).  More specifically, the deliberate indifference standard "requires a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir. 1990).

The record in this case contains sufficient evidence that the Jail's policies constituted deliberate indifference to Escano-Reyes' constitutional rights. The Jail knew that Escano-Reyes was suicidal. Nonetheless, the Jail's policies allowed Escano-Reyes to be placed in a cell with a metal partition on which a ligature could be tied and with the majority of its windows concealed by curtains or other coverings. And contrary to the Jail's written procedures, its custom allowed deputies to monitor Escano-Reyes by performing a solely visual check—in this case, merely seeing flashes of movement—from the booking desk rather than confirming that he was safe. While liability is inappropriate where only "the mere opportunity for suicide, without more," exists, *Tittle v. Jefferson Cnty. Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994), the evidence in this case established far more than the mere possibility that Escano-Reyes would inflict self-harm.

We are not persuaded by the Sheriff's arguments that the circumstances were insufficient to create a known or obvious risk of suicide. The Sheriff contends, for instance, that he lacked notice of the risk that Escano-Reyes would commit suicide with the suicide smock. But the United States Supreme Court has held that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).[9] Here, the Jail's own representative

---

[9] *Farmer* concerned a claim for deliberate indifference under the Eighth Amendment. 511 U.S. at 828–29. Although Rogers' *Monell* claim arises under the Fourteenth Amendment, *Farmer* remains relevant for our analysis. *See*

conceded at trial that the practice of housing suicidal inmates in a cell with a partially concealed interior both impeded adequate monitoring and posed an obvious risk.  Moreover, an official need not have knowledge of the precise risk that ultimately materializes; awareness of "an obvious, substantial risk to inmate safety" is enough.  *Id.* at 843.  In this case, the evidence at trial showed that the Jail's policies—placing an inmate in a cell with partially concealed windows and with a partition on which a ligature could be tied, and allowing deputies to monitor that inmate by catching momentary glimpses of him through a window—created an obvious risk of suicide.

Our task is to "determine 'whether or not reasonable jurors could have concluded as this jury did based on the evidence presented.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997) (quoting *Quick v. Peoples Bank*, 993 F.2d 793, 797 (11th Cir. 1993)).  We have reviewed the record *de novo*, and we conclude that Rogers presented sufficient evidence of deliberate indifference to require submitting this matter to a jury in the first instance and to support the jury's ultimate verdict.  As such, the

---

*Tittle*, 10 F.3d at 1539 (noting that "[w]hether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial" because, in either posture, a plaintiff in a prisoner suicide case must show that a jail official acted with deliberate indifference).

Sheriff was not entitled to judgment as a matter of law, and the district court did not err by denying his Rule 50 motions.

## B. The Sheriff's Motion to Amend the Judgment

The Sheriff asserts that the jury was required to find either Gaddis or Bauman liable under § 1983 as an element of *Monell* liability. He is incorrect.

We begin by briefly explaining the Sheriff's argument. As stated previously, a plaintiff bringing a *Monell* claim must show (1) the violation of a constitutional right, (2) that a municipality had a custom or policy of deliberate indifference to that right and (3) that the custom or policy caused the violation. *McDowell*, 392 F.3d at 1289. In the Sheriff's view, the first component—a constitutional violation—requires a plaintiff to establish the same elements that form an individual § 1983 claim. That is, to show a constitutional violation for the purposes of *Monell* liability, a plaintiff must establish, as to an individual, "(1) a substantial risk of serious harm; (2) the [individual's] deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). But in this case, the jury found only (1) and (2) as to Gaddis and Bauman and attributed (3), causation, to the Sheriff instead. According to the Sheriff, because the jury found that Gaddis and Bauman were not liable under § 1983, no constitutional violation occurred, and Rogers' *Monell* claim necessarily failed.

The issue before us, then, is whether individual liability under § 1983 is a necessary element of municipal liability under

*Monell*. We addressed this question in *Barnett v. MacArthur*, 956 F.3d 1291 (11th Cir. 2020). In that case, a deputy arrested the plaintiff for driving under the influence and transported her to jail. *Id.* at 1295. The jail's hold policy required detaining a DUI arrestee for eight hours, even in the absence of positive test results and even if the arrestee posted bond. *Id.* Two breath samples showed no alcohol or drug content, and the plaintiff posted bond—but she was nonetheless detained for eight hours pursuant to the jail's hold policy. *Id.* at 1295–96. The plaintiff sued the arresting deputy under § 1983 and the sheriff under § 1983 and *Monell*, alleging against both the violation of her Fourth Amendment rights. *Id.* at 1293. The district court granted summary judgment to the sheriff on the *Monell* claim, and later, a jury returned a verdict in favor of the deputy. *Id.* The plaintiff appealed, and we reversed the district court's summary judgment ruling. *Id.*

On appeal, the sheriff argued that he could not be liable because "the jury verdict mean[t] that there was no Fourth Amendment violation, and without a Fourth Amendment violation there cannot be municipal liability under *Monell*." *Id.* at 1301. We rejected this "superficially seductive" "syllogism" and reiterated our prior holding that "*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government." *Id.* (alteration in original) (quoting *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985)). Indeed, "municipal liability can exist if a jury finds that a

constitutional injury is due to a municipal policy, custom, or practice, but also finds that no officer is individually liable for the violation." *Id.*

Such is the case here.  The jury's verdict represents a finding that the Jail's policies—not the actions of the individual deputies— were the "'moving force' [behind] the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alteration in original) (quoting *Monell*, 436 U.S. at 694).  The Sheriff conflates the elements of a § 1983 claim against an individual officer with *Monell*'s requirement of a constitutional violation.  They are not one and the same.  *Barnett* forecloses the Sheriff's argument, and accordingly, we find no abuse of discretion in the district court's denial of relief under Rule 59(e).[10]

---

[10] The Sheriff also contends that the verdict form was incorrect because it allowed the jurors to reach the question of *Monell* liability without finding all three elements of individual § 1983 liability as to either Gaddis or Bauman.  He did not, however, raise this issue while the jury was still empaneled.  To the extent that the Sheriff's argument sounds in verdict inconsistency, he likely waived it by failing to timely assert the issue.  *See Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1259 (11th Cir. 2015) (explaining that "[a] party must object to a verdict as inconsistent before the jury has been dismissed" and that "failure to object to an inconsistent verdict before the jury is excused forfeits the objection").  But because *Barnett* is dispositive of the relationship between individual liability under § 1983 and liability under *Monell*, we assume without deciding that the Sheriff did not waive this argument.

## V.    CONCLUSION

We have reviewed the record in this case and found no error in the district court's denial of the Sheriff's motions for judgment as a matter of law.  Likewise, the district court did not abuse its discretion by denying the Sheriff's motion to amend the judgment under Rule 59(e).

**AFFIRMED.**